765 A.2d 208 (2001)
336 N.J. Super. 379
Katherine PFENDER and Walter Pfender, husband and wife, Plaintiffs-Appellants,
v.
Joseph A. TORRES and Don Rosen Imports, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 2000.
Decided January 16, 2001.
*210 Mark R. Kehoe, Philadelphia, PA, argued the cause for appellants (Monteverde, McAlee, Fitzpatrick, Tanker & Hurd, attorneys; Mr. Kehoe, on the brief).
Mitchell S. Berman, Vineland, argued the cause for respondents (Eisenstat, Gabage, Berman & Furman, attorneys; Mr. Berman and Patricia A. Powell, on the brief).
Friedman, Bafundo & Porter, Cherry Hill, for amicus curiae Association of Trial Lawyers of America (Robert A. Porter, on the brief).
Before Judges COBURN, AXELRAD and LANDAU. *209
*211 The opinion of the court was delivered by COBURN, J.A.D.
In this automobile accident case, plaintiffs filed a pretrial motion for discovery of the defendant-driver's statements to his insurer describing the event. The judge denied the motion on the ground that the statements were protected from discovery by the attorney-client privilege and the work-product rule. Subsequently, a jury found both participants in the accident negligent, assigning 70% of the fault to plaintiff Katherine Pfender, a pedestrian, and 30% to the defendant-driver. Plaintiffs appeal. We reverse and remand for a new trial because we are satisfied that the statements were discoverable and because they reveal information that might well have led the jury to a contrary result.

I
On October 31, 1996, plaintiff Katherine Pfender was injured at a gas station when defendant Joseph A. Torres drove his employer's car over her foot. She testified that after purchasing cigarettes at the island, she looked for approaching cars, saw none, and started walking away. After taking two or three steps, she sensed something coming and at that moment the car's right front tire drove over her left foot. When a station attendant yelled at the driver, he backed up, driving over her foot a second time. Immediately after the contact, she said that she saw the driver, Torres, speaking on a mobile telephone. Torres testified on direct-examination that he entered the gas station at a speed of "[a]pproximately five miles per hour." He said he was coming to a stop at an island when "something or someone" that he had not previously observed "stepped out and right into my right fender." At that point he was "almost to a complete stop" and he "heard the impact or someone screaming." He immediately put his car in reverse. He denied that he was speaking on his mobile telephone at the time. On cross-examination, Torres admitted that it was possible that he entered the gas station at a speed of ten miles per hour. He claimed that when he saw plaintiff she was at the side of his car.
In summation, defense counsel emphasized three points: (1) the records for the mobile telephone indicated it was not in use at the time of the accident; (2) there was no evidence that Torres was driving at an undue speed; and (3) the injured plaintiff falsely claimed that she had been standing at the island as Torres pulled into the gas station so that he should have seen her earlier and been able to avoid the accident. In regard to the two latter points, defense counsel's comments included these statements:
In fact the only evidence was from him [Torres] that he was driving five, maybe ten miles an hour through this gas station parking lot and as he was pulling up to the pumps. So I would suggest to you that there's no evidence of undue speed.
....
The next issue ... with respect to the allegation that Joe was negligent is whether or not he could see her as he was pulling up to the pumps. As you remember, he admitted that he didn't see her until he saw her from his peripheral vision just about the time that she was walking into the right front fender of his car. He didn't see her before that.... [I]f she was standing ... where she says she was standing ..., Joe Torres could have seen her. Well, Joe admitted that in his testimony. If she was standing there, he could have seen her as he was pulling up to the pumps.
....
I agree with that. But I will suggest that that's not where she was standing. She wants you to believe that she was standing there so that you'll decide that Joe could have seen her and could have taken some efforts to avoid hitting her when she walked out into his path of travel.
*212 At our request, defense counsel submitted for in camera review the transcripts of two tape-recorded statements given by Torres to an insurance investigator who introduced himself as the agent for the insurer of Torres' employer, defendant Don Rosen Imports, Inc. ("DRI"). The agent did not indicate that he was there to represent or protect Torres.
In the first statement, dated August 8, 1997, Torres acknowledged that the car he was driving was owned by his employer but provided to him for business and pleasure. He said that when he drove into the gas station he was traveling at "5, 10, maybe 15 [miles per hour]." He then said that as he was "coming and proceeding to slow down, I probably at the most was doing 10, 15 MPH, if that." Needless to say, those descriptions of his speed might well be seen as inconsistent with his trial testimony.
The statement also differed sharply from his trial testimony on the question of when and where he first saw plaintiff. He said he first saw her
[at] the island, and she turned and stepped down from the island into my path. So she must have just paid for her cigarettes and then proceeded to turn and step, as quickly as it happened, it didn't look like she even looked.
In the second statement, taken on October 2, 1997, this dialogue occurred:
COULD YOU ESTIMATE YOUR SPEED ... AT THE TIME OF THE IMPACT?
Maybe 5MPH and it wasn't like I was flying thru the island.
Universal Underwriters Insurance Company insured both defendants. It opened a file in this matter in response to a July 7, 1997 letter from plaintiffs' attorney to DRI asserting their claims. The claims examiner certified that he assigned the investigation to an outside adjuster "specifically in response to the claim being asserted, and the potential lawsuit, on behalf of Mrs. Pfender." He further certified that he asked the adjuster to
take statements from Mr. Torres both to learn about the facts surrounding the happening of the accident and for use in defense of the claim and any lawsuit. Although no lawsuit had yet been filed, and we had not yet assigned an attorney to defend our insured, the attorneys we utilize, including [the attorney who was eventually assigned this case] request that we have statements from insured's employees who are involved in accidents, so that any available defenses can be prepared.
Torres, demonstrating what some might consider a remarkable understanding for a layman of the law of attorney-client privilege, certified as follows:
At the time I gave these statements, it was my understanding that these were confidential communications between myself and a representative of my insurance company, the purpose of which was to defend me and my employer from the claim being asserted by Mrs. Pfender for personal injuries. Although I knew that the statements were being recorded, my assumption was that these statements were to be used in my defense, and that they were private, privileged communications.

II
Although courts in other jurisdictions have differed in their application of the attorney-client privilege to an insured's post-accident statement to his insurer,[1] the dominant view is that such statements are discoverable. Appleman, 20B Insurance Law and Practice, § 12082, at 624-25 (1980). When the issue arose in this state, we adopted the prevailing resolution of this issue, as "the better view." State v. Pavin, 202 N.J.Super. 255, 261-62, 494 *213 A.2d 834 (App.Div.1985). Writing for the court, Justice (then Judge) Long had this to say:
[N]o blanket privilege with respect to communications between an insured and his adjuster should be countenanced. Rather the privilege should be held to shield communications between the insured and the adjuster only where the communications were in fact made to the adjuster for the dominant purpose of the defense of the insured by the attorney and where confidentiality was the reasonable expectation of the insured.
[Id. at 262, 494 A.2d 834.]
In making a determination with respect to those purposes and expectations, the court endorsed consideration of these factors: whether the statement was made at the direction of an attorney; whether there was anything indicating the insured was seeking legal advice; whether there was pending litigation; and whether the insurance company might have interests other than protecting the insured's rights. Ibid.
The interview between the insurance adjuster and Pavin occurred because of Pavin's involvement in an automobile accident which ultimately led to his indictment for death by automobile. Although the opinion does not indicate that a claim had been made, the accident apparently had been reported by the named insured, Pavin's mother. The interview occurred ten days after the accident and was taken "to evaluate the insurance company's exposure to liability." Id. at 258, 494 A.2d 834. In ruling that the statement was not privileged, the court said:
There was no evidence ... that the insurance adjuster was acting in accordance with instructions from his employer's attorney, or that an attorney had even been retained by the carrier to review the file. At this early stage, the adjuster was representing the interests of his principal, the insurance company, and not those of the insured.
[Id. at 263, 494 A.2d 834.]
As Justice Long observed, the cases applying the attorney-client privilege to this circumstance "assume that any such communication is made for the dominant purpose of transmitting information to an attorney for the protection of the insured's interests." Id. at 261, 494 A.2d 834. The opposing cases recognize that "an insurance carrier has the right to review and consider an insured's statement for any legitimate purpose connected with the company's business, such as coverage, cooperation, or renewal." Ibid. As she further noted,
The statement is ordinarily used by the insurer to determine whether and on what basis adjustment of the claim could be attempted. Only if adjustment is not effected and a claim is pursued, will the information be turned over to counsel for use in litigation. If the insured gives a false statement, or a statement which supplies facts regarding some other defense against the insurer's liability under the policy, the insurer can make use of those facts to the detriment of the insured. Thus, these cases say that the relationship is not automatically comparable at all stages to that of attorney and client, since it is not at all clear that insured's interests are being protected by the insurance carrier.
[Id. at 261-62, 494 A.2d 834.]
An insurance company is not an eleemosynary institution. Legitimate concerns of self-preservation often place it in direct conflict with those whom it insures against liability. The avoidance of fraudulent claims and claims outside the insurance coverage justify careful investigation before undertaking a defense of the insured, as is well-evidenced by the never-ending flow of cases involving denials of liability coverage. Only the incredibly naive would suppose that an insurance company's first concern is anything other than whether it is obliged to provide a defense. As Justice Holmes is quoted as saying, "`Judges need not be more naive *214 than other men.'" People ex rel. Terry v. Fisher, 12 Ill.2d 231, 239, 145 N.E.2d 588, 593 (1957). No reasonable person could be unaware of this adversarial aspect of the insurer-insured relationship. Therefore, we express our complete agreement with the principles expressed in Pavin.
Under those principles, the statements taken here were not privileged. In reaching that conclusion, we put little if any weight on the self-serving aspects of the certifications prepared by counsel for execution by the claims examiner and the insured and submitted in opposition to the discovery motion. Perhaps it is worth noting that the first statement reveals that the adjuster introduced himself to Torres as the agent of his employer's insurance company and that nothing in either statement even intimates that Torres was an insured under the policy. But, that is not to suggest that our view would be different if the adjuster had indicated that he was conducting the interview as a representative of the insurance company for both Torres and his employer. The key factor for denying the claim of privilege is this: the statement was not taken at the specific direction of the insured's attorney. Indeed, the claim had not even been assigned to an attorney for the insured. Moreover, there was no contemporaneous evidence that the insured was seeking legal advice. Litigation was not pending, and at that early point the insurance company might well have had interests other than protection of this insured's rights.
Defendants contend that Pavin is distinguishable because here the interview occurred after the insurance company received a claim letter and because one of the reasons for taking the statement was to assist the attorney to whom the case might be assigned. The first supposed distinction is meaningless. Obviously, an insurance company does not open an investigation unless a claim has been or may be filed. The actual receipt of the expected claim letter changes nothing with respect to the nature and multiple purposes of the investigation once the company learns of its possible exposure. The same may be said as well for the filing and service of a complaint. The attorney-client privilege should be inapplicable unless and until the interrogation of the insured has occurred at the direction of the attorney assigned to the insured. The second supposed distinction is equally without merit. Before an attorney is assigned the case it cannot be reasonably said that the "communications were made in fact to the adjuster for the dominant purpose of the defense of the insured by the attorney [or] that confidentiality was the reasonable expectation of the insured." Pavin, 202 N.J.Super. at 262, 494 A.2d 834. At that point, the potential adversarial aspects of the insurer-insured relationship still exist and cannot be said to be dominated by the purpose of defending the insured.
Our approach to resolving the competing values of full disclosure in the search for truth and the attorney-client privilege is informed by these words of Justice Jacobs:
Throughout their judicial endeavors courts seek truth and justice and their search is aided significantly by the fundamental principle of full disclosure. When that principle conflicts with the attorney-client privilege it must, of course, give way but only to the extent necessary to vindicate the privilege and its underlying purposes. The matter is truly one of balance....
[In re Richardson, 31 N.J. 391, 401, 157 A.2d 695 (1960).]
We are satisfied that neither the attorney-client privilege, embodied in Evid. R. 504 and N.J.S.A. 2A:84A-20, nor its underlying purposes would be served by preventing the disclosure in this case. There is no respect in which our ruling impairs "the general effectiveness of the privilege in affording to clients a proper measure of freedom from apprehension in consulting their legal advisers." In re Richardson, 31 N.J. at 401, 157 A.2d 695. In these circumstances any reasonable person would understand that although the statements might be used by an attorney to assist in defense, they might just as easily be used *215 by the insurance company to deny coverage. Therefore, we conclude that the trial judge erred in denying the motion for disclosure by application of the attorney-client privilege.

III
Defendants also contend that discovery of the statements is inappropriate under the qualified privilege provided by the work-product rule, R. 4:10-2(c), which states, in pertinent part, that a party may obtain discovery of relevant, unprivileged documents
prepared in anticipation of litigation ... by or for another party or by or for that other party's representative (including an ... insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials ..., the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
Justice Clifford, speaking for the Court in Jenkins v. Rainner, 69 N.J. 50, 350 A.2d 473 (1976), construed this rule as requiring discovery of virtually all materials other that those reflecting the representative's impressions and legal theories:
Much of what was traditionally included as non-discoverable "work product" has in recent years been stripped of its absolute protection. So it is that now one is hard put to conceive of any non-privileged relevant material which enjoys an unqualified protection against discovery, that favored status of absolute immunity being reserved for "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." While reaffirming the sacrosanct character of whatever may be included in these latter categories, we hold as well that if the industry of counsel or his investigator results in a piece of concrete evidence, such as the motion picture films in this case, then that evidence is not rendered non-discoverable solely because of the "work product" doctrine. If it be non-discoverable despite its relevancy and the absence of privilege, it must be by reason of some exception provided for by our discovery Rules.
[Id. at 54-55, 350 A.2d 473 (citations omitted).]
Following the principles annunciated in Jenkins, we held that "where a fact witness testifies for an adverse party, the factual statement of that witness must be produced on demand for use in cross-examination as a potential tool for impeachment of credibility." Dinter v. Sears, Roebuck & Co., 252 N.J.Super. 84, 100, 599 A.2d 528 (App.Div.1991).
Another panel of this court revisited the subject in Medford v. Duggan, 323 N.J.Super. 127, 732 A.2d 533 (App.Div. 1999). The majority opinion rejected Dinter, concluding "that a requirement that all statements made to an insurance carrier must be provided in the discovery process without the necessary showing of an inability without undue hardship to obtain the substantial equivalent of the statement by other means would eviscerate R. 4:10-2(c)." Id. at 138, 732 A.2d 533. The majority began its analysis by noting that "to overcome the work-product privilege the moving party must establish: (1) that he has substantial need of the requested documents; and (2) that he is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means." Id. at 136-37, 732 A.2d 533. It properly acknowledged that the first prong of that test is "always satisfied when a party seeks discovery of statements of another party or of a witness." Ibid. The majority then turned to what it considered the core issue:
The real question is whether the party seeking discovery can satisfy the second prong, the inability to obtain the substantial equivalent of materials by other means. After all, the person who gave the statement may always be deposed.

*216 Moreover, the deposition may often constitute the substantial equivalent of the prior statement. Thus, after the deposition is taken, the court is better able to determine whether the second prong has been satisfied.
[Ibid.]
Applying those principles, the majority considered the depositions of the two witnesses whose prior statements were sought. It determined that plaintiffs were entitled to discovery of the prior statement of the witness who had difficulty recalling the circumstances surrounding the accident but were not entitled to the prior statement of the witness who "essentially expressed a clear recollection of the events in question." Ibid. The majority reasoned that since the witness's recollection was good, "the deposition constitutes the substantial equivalent of her prior statement. Therefore, plaintiffs have not satisfied the second prong of R. 4:10-2(c)." Ibid.
Judge Brochin dissented, noting the discordance between the majority's analysis of the Rule and the principles endorsed by the Supreme Court in Jenkins. Id. at 140, 732 A.2d 533. He also emphasized the sound view that there is no equivalent to a witnesses's inconsistent prior statement. Ibid. Finally, he concluded that adherence to Jenkins justified extension of Dinter to provide for the discovery before the party or witness is interrogated at a pre-trial deposition. Ibid.
We agree with Judge Brochin. We are satisfied that under the Rule as written and as construed by the Supreme Court in Jenkins, the statement of a party to his insurer is not protected from discovery, at least to the extent that it consists of statements describing the accident.
Although we have quoted discoverable portions of the statements for purposes of this opinion, in doing so we do not mean to suggest that those are the only portions to which plaintiffs are entitled. Since other portions of the statements contain comments that could be viewed as "mental impressions, conclusions, opinions, or legal theories" of the insurer's agent, on remand the judge shall review the statements in camera, deleting any material of that nature.
On the issues of negligence and comparative negligence, this was a close case, one requiring of the jury a careful and considered weighing of the evidence. As we have noted, Torres' prior statements differ from his trial testimony in ways that a jury might well consider significant. If accurate, those statements clearly suggest that he was driving faster and that he saw Mrs. Pfender earlier and at a time when with due care he might well have been able to avoid striking her. Since the denial of the statements prejudiced plaintiffs' rights, a new trial is warranted.

IV
Plaintiffs also sought damages from Torres' employer, defendant DRI, on the theory of respondeat superior. At the conclusion of the evidence, this defendant successfully moved for a directed verdict. Plaintiffs contend that the judge erred in that regard. We agree.
These are the additional facts bearing on this aspect of the case. DRI is a car dealership which sells BMWs. It employed Torres as a salesman. Pursuant to a union contract, DRI provided Torres with a BMW for business and personal use while retaining ownership of the car. Usually, a member of the sales staff received a new BMW, which he would operate until it was sold by DRI. The assigned cars were used for customers as "demonstrators" during working hours and to run work-related errands. At all other times, the cars were for personal use. DRI's general sales manager explained that apart from the dictates of the union contract, the salesmen were provided with the cars for two reasons, as "an incentive for them to be here and two, is a transportation need. Because a lot of them, the sales people here are experienced sales people and they come from dealerships that have had demo programs. So a number of them don't have cars." He also indicated that the cars bore DRI identification and that one of the reasons for *217 providing them was "to obtain promotional and advertising benefits which are derived when the salesmen drive the cars the dealership sells[.]" When the accident occurred, Torres was not engaged in any business-related errand, but he was driving to work.
Generally, an employer is not liable for harm caused by an employee in the use of a vehicle owned by the employer when the use is not within the employee's scope of employment. Gilborges v. Wallace, 78 N.J. 342, 351, 396 A.2d 338 (1978). Liability for the employer is only appropriate if the vehicle is being used by the employee "for the purpose of advancing the employer's business or interests, as distinguished from the private affairs of the [employee]." Ibid. But there may of course be dual purposes. Thus, when an employee is acting in furtherance of his own interests and those of the employer, the employer is subject to liability. Ibid.
In Mannes v. Healey, 306 N.J.Super. 351, 703 A.2d 944 (App.Div.1997), we considered the liability of an employer for its employee's negligent operation of her own vehicle on the way to work. We endorsed the generally accepted rule in that circumstance of no employer liability, but we also noted with approval that one of the recognized exceptions to that rule "is where an employer requires the employee to drive his or her vehicle to work so that the vehicle is available for use in fulfilling the employee's work-related responsibilities." Id. at 354, 703 A.2d 944 (citing Oaks v. Connors, 339 Md. 24, 660 A.2d 423, 426-27 (1995)).
DRI's liability under that well-recognized exception is clear since Torres was driving to work when the accident happened and he was required to use the car in the performance of his employment as a demonstrator to encourage sales and to run work-related errands. Since the evidence was uncontested on these issues, plaintiffs were entitled to a directed verdict on the issue of DRI's liability under the doctrine of respondeat superior. Therefore, we reverse the judgment granting DRI a directed verdict and remand for entry of partial summary judgment in favor of plaintiffs on this aspect of the case.
Reversed and remanded.
LANDAU, J.A.D. (retired and temporarily assigned on recall), concurring.
I concur with the majority's opinion, based upon the facts in this case. I write separately to reflect my view that the opinion should be more narrowly tailored to those facts, and that it should not be read to mean that an accident statement given by an insured to its insurer's investigator before a lawyer is assigned can never be the subject of a viable privilege. In matters not presently before us, there may, for example, be circumstances in which there is no potential for an interest of the insurer that is adverse to its insured.
NOTES
[1] John J. Manier, Comment, The Attorney-Client Privilege and Its Availability to Insured Persons, 36 UCLA L. REV. 977 (June, 1989); John P. Ludington, Annotation, Insured-Insurer Communications as Privileged, 55 A.L.R.4th 336 (1987).