935 A.2d 1236 (2007)
397 N.J. Super. 64
CARBIS SALES, INC., d/b/a Carbis Ladders, and Safe Step Reinsurance, Inc., Plaintiffs-Respondents/Cross-Appellants,
v.
Israel N. EISENBERG, Esq., and Post & Schell, P.C., formerly known as The Law Offices of Stanley P. Stahl, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2007.
Decided December 11, 2007.
*1240 Kenneth Mauro (Mauro Goldberg & Lilling) of the New York bar, admitted pro hac vice, argued the cause for appellants/cross-respondents (Dugan, Brinkman, Maginnis and Pace, and Mr. Mauro, attorneys; Caryn L. Lilling, Great Neck and Gerald J. Dugan, Philadelphia, PA, on the brief).
Glenn A. Bergenfield, Princeton, argued the cause for respondents/cross-appellants.
Before Judges LINTNER, PARRILLO and SABATINO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
In this legal malpractice action, defendants Israel N. Eisenberg and his former law firm, Post & Schell, P.C., appeal from a final judgment awarding their former clients, plaintiffs Carbis Sales, Inc. (Carbis or plaintiff) and Safe Step Reinsurance, Inc. (Safe Step) $704,405.20 in damages. On appeal, defendants contend that the trial court erred in admitting the net opinion of plaintiffs' expert and in refusing them discovery of a memo prepared by an investigator retained by plaintiffs. Plaintiffs cross-appeal, arguing that the trial court erred in denying them a new trial on damages or additur.
Plaintiffs' legal malpractice claim arose out of their representation by defendants in an underlying products liability cause of action filed by Dennis Carr, who alleged that the ladder from which he fell was defectively altered by Carbis, a ladder distribution company. The facts adduced during that trial established that at the time of the accident on April 7, 1990, Carr was working as a poly-seal foam insulator for Red Lion Insulation (Red Lion) inside one of the homes under construction in a residential development (Carriage Park) being built by U.S. Homes. He had used a six-foot ladder manufactured by R.D. Werner (Werner), which he had positioned in the foyer in front of the main entry door, with a canister of Polycel on his back, in order to spray insulation around the seams of the door and the second-story window above. As he was descending the ladder, Carr heard a cracking noise and felt the ladder twist. He immediately jumped off to the left from a height of two or three feet and landed in a cut-out heating/air conditioning vent. Experiencing terrible back pain, Carr loaded the ladder onto his truck and left the development for home.
Carr was ultimately diagnosed with herniated discs at L4 and L5 and underwent a laminectomy in August 1990. He was out of work for almost a year-and-a-half, and thereafter, due to residual pain and numbness, claimed he was unable to return to work as an insulator. Instead, he found work as a truck driver at a reduced salary. Carr also maintained that his condition contributed to the demise of his marriage and rendered him unable to enjoy many recreational activities.
When Carr did not return to work on April 9, 1990, he was fired from his job by Dave Ryan, Red Lion's president. Ryan also retrieved the company truck and ladder from Carr's home. Sometime later, Carr called a fellow employee, Steve McMichael, who supposedly returned the ladder to Carr. According to Carr's expert's *1241 inspection, the ladder had been cut down from twelve feet to six feet by Carbis prior to the fall.
Carr filed his original complaint on January 3, 1992, alleging that U.S. Homes' structure where he fell was in a defective condition and that the defect was a proximate cause of his fall and injuries. Carr also asserted a strict liability claim against Werner, manufacturer of the ladder, and included as defendants "John Does 7-10" who, Carr claimed, "marketed, sold, distributed, shipped, and/or delivered the defective ladder, or were otherwise involved in placing the ladder into the stream of commerce." U.S. Homes joined Tempcon Corp., the HVAC subcontractor at Carriage Park, and Red Lion as third-party defendants. In October 1994, Carr amended his complaint substituting for John Doe 7, Carbis, who Red Lion claimed exclusively repaired all its ladders, alleging that Carbis was negligent in altering the twelve-foot ladder by cutting it down to six feet and then placing it in the stream of commerce by selling it to Red Lion.
U.S. Homes moved for summary judgment, arguing that the "sole basis" for being named a party defendant was Carr's "unsubstantiated assertion that the accident took place somewhere in Carriage Park," the development being built by U.S. Homes. U.S. Homes pointed out that Carr was unable to give an address or an exact location of the house where the accident occurred. It also noted that when Carr went to the development and identified two houses where the accident might have occurred, neither house had a vent cut out next to a stairway where, according to Carr, he fell from the ladder. The trial court granted U.S. Homes summary judgment on April 29, 1996.
Following suit, Carbis filed a two-prong motion for summary judgment, arguing: (1) the grant of summary judgment in favor of U.S. Homes constituted a finding that, as a matter of law, Carr was unable to prove how, when, and where his accident occurred and that no rational factfinder could resolve the disputed evidence in Carr's favor; and (2) Carr was unable to establish a reliable chain of custody regarding the alleged ladder, and was unable to identify the ladder as the one he was using on the date of the accident. In opposition, Carr submitted an affidavit stating that the ladder he fell from on April 7, 1990 was the same ladder he turned over to his attorney and was the same ladder retrieved for him by McMichael, who was employed by Red Lion at the time. In light of Carr's affidavit, the trial court denied Carbis' motion, concluding there were genuine fact issues as to product identification.
At the close of Carr's case, the complaint against Werner was dismissed. On its case-in-chief, Eisenberg, Carbis' trial attorney, presented evidence to the jury that: (1) Carbis, an experienced and reputable ladder repair company, could not possibly have repaired the ladder that Carr fell from; and (2) Carr could not establish the chain of custody for the ladder placed in evidence. However, despite the fact that the central fact issue was whether Carr had properly identified the ladder that was defective, Eisenberg failed to produce McMichael to ascertain whether he would corroborate Carr's account of the ladder's retrieval  a version belied by a June 29, 1990 letter from Carr's attorney to Red Lion requesting production of the ladder. Eisenberg also did not offer into evidence photos depicting the height of the Carriage Park foyer windows, suggesting that a six-foot ladder would have been insufficient for the work allegedly performed by Carr, or proof that there was a twelve-foot ladder on Carr's truck. Nor did he call the engineering experts, Nicholas *1242 Colanzi and Raymond Sams, who had been instrumental to the other defendants' successful disposition based on Carr's description of his fall.[1]
Moreover, Eisenberg did not produce a defense medical expert to testify about the effects of Carr's several subsequent accidents; about his statement in an unrelated 1992 deposition that his back was fine; or about the fact that he had not sought any medical treatment for his back since 1994. Eisenberg also chose not to call an economist to counter Carr's testimony on lost income.
At the close of Carr's case, the complaint against Werner was dismissed. The jury thereafter returned a verdict in favor of Carr and against Carbis, assessing damages in favor of Carr in the amount of $600,000 and damages to his wife in the amount of $100,000 on her consortium claim. Including prejudgment interest and counsel fees, judgment was entered in the amount of $1,005,842.27. Of this, Carbis actually only paid its $15,000 deductible, while Safe Step, its primary insurer, contributed its full policy amount of $500,000 ($395,000 of which went to Carr). Lexington Insurance Company, Carbis' secondary insurer, paid the remaining $500,000.[2]
Subsequently, in April 2001, plaintiffs Carbis and Safe Step sued Eisenberg and his firm Post & Schell for legal malpractice.[3] At the jury trial, it was established that the law firm was hired to defend Carbis in the products liability action and Beth Wright, a member of the firm, was initially assigned to handle the matter. She proceeded to investigate the case and retained an expert, Johnson, who was prepared to testify that the ladder was unusable prior to the accident and could not have been repaired by Carbis. Wright, however, left the firm on June 16, 1997 and the Carbis file, which included 2400 pages of depositions, nine expert reports and various summary judgment motions, was reassigned to Eisenberg. Although Eisenberg claimed to have immediately commenced reviewing the file, he could not quantify any such time spent. Moreover, his timesheets prior to September 11, 1997, do not reflect any billable hours charged Carbis, and instead document that during this same time he was billing other clients an average of 56 hours per week.
Eisenberg's time records do document that he began preparing the case on September 11, 1997, five days before the ten-day trial began. He spent a recorded total of 20.3 hours in preparation, which did not include meeting or speaking with Samuel Cramer, who headed Carbis, or Paul Junius, a principal in the firm hired to manage all claims against Carbis. During this time, Eisenberg did not prepare any witnesses or any deposition summaries. His *1243 file contained no memos or notes other than eight "stickies" that he claimed constituted his deposition review system. He was unaware of, and consequently did not review, a surveillance tape of Carr obtained by another defendant that might have suggested that Carr was not as debilitated as claimed.
McMichael testified at the malpractice trial that he had never been asked by Carr to retrieve a ladder and that he did not do so. George Repko, who worked as Carbis' principal ladder repairer at the time of Carr's accident, reported that he could have been located in 1997 and that he would have testified at the trial had he been asked. He denied repairing the ladder in question, which was probably returned to Red Lion in a damaged condition because Red Lion refused to pay disposal fees for unsalvageable ladders. Repko followed an inspection list when repairing ladders, including ensuring that all required warning labels were in place, and that the absence of warning labels on the subject ladder indicated that he had not repaired it.
Sams, the engineering expert, explained that not only did Carr's description of the house in which he fell not match any of the homes in Carriage Park, but also it was physically impossible for Carr to have used a six-foot ladder to perform his job or to have fallen in the manner he claimed. Specifically, Sams noted that the top of the foyer windows in the Carriage Park homes most similar to the home Carr described measured twenty feet high. Further, the vent Carr claimed to have stepped into would have been five to six feet from the ladder and ten feet from the door. Sams attempted to recreate the accident and found that it would have been "extraordinarily difficult" for the accident to have happened as Carr alleged.
Plaintiffs' legal malpractice expert, Bennett Wasserman, opined that Eisenberg did not comply with the standard of care for properly preparing a case for trial. He faulted Eisenberg for numerous lapses including: (1) not putting in enough time on the file; (2) failing to meet and prepare his witnesses; (3) not contacting McMichael; (4) failing to locate the two "kids" who were present at the time of the alleged accident; (5) failing to call Colanzi and Sams to describe the physical impossibility of the accident as described by Carr; (6) failing to call an orthopedist and economic expert; (7) failing to rely upon Carr's counsel's letter seeking the return of the ladder from Red Lion; and (8) failing to call Repko. Wasserman noted that, in his experience, cases involving surgical herniated discs were usually worth $50,000 to $150,000, and that, in his opinion, the Carr jury reached its verdict because of a wholly avoidable lack of evidence on behalf of the defense.
In contrast, Eisenberg testified he had had no evidence to contradict Carr's version of the fall and that Carr's story was "compelling". Also, he did not believe that Carr's medical condition was an "open" issue. He insisted that his decision not to call McMichael or the various experts retained by co-defendants was an appropriate judgment call. He further claimed that the Carbis ladder repairers were not available as witnesses for the defense.
Warren Faulk testified as a defense expert that Eisenberg's representation of Carbis exceeded the standard of care, and that he exercised proper judgment in deciding not to attack plaintiff's credibility. Faulk further maintained that Eisenberg was under no obligation to present an expert to counter every expert presented by the plaintiff. Faulk conceded, though, that in reaching his opinion he had not been aware that Eisenberg never met with any *1244 witness prior to trial, and further acknowledged that defendant should have spent many more hours reviewing the case and preparing for trial. Lastly, Faulk admitted that he would have looked for McMichael and that he had no idea why McMichael was never deposed.
The jury ultimately returned a general verdict, finding defendants negligent in their representation of plaintiffs and awarding plaintiffs $362,561.70 in damages. Defendants moved for a new trial as did plaintiffs who, in the alternative, moved for additur, and in either case for an award of legal fees and costs. On April 17, 2006, the trial court entered an order denying both new trial motions but awarding plaintiffs an additional $253,517.51 in costs and fees for a total judgment of $704,405.20, including prejudgment interest. This appeal and cross-appeal follow.

(I)

(A)
On appeal, defendants argue the trial court erred in admitting the net opinion of plaintiffs' expert. Actually, this contention was first made below in a pre-trial motion to bar Wasserman's testimony. The motion judge denied relief, determining that Wasserman had provided the "why[s] and wherefore[s]" and "could sit before a jury, . . . [and] tell them I think this case would have gone a different way, and it is based on factual data, and legal conclusions." Then, at the close of plaintiffs' case, defendants moved for a directed verdict based on the same grounds. The trial judge rejected this argument as well, reasoning:
I took very copious notes because one of the concerns I had was whether there was actually a standard of care or a personal opinion as to what should be done. And I'm satisfied that there was testimony that took it out of . . . personal opinion. . . . Wasserman testified about the standard that he teaches, that there's a standard of care . . . that has been enumerated so I thought he went sufficiently beyond a personal opinion of a standard of care, that he established that there's a standard of care. Whether the jury puts any weight on it or not will be summation. And there was cross-examination by you on that. And on the facts upon which the opinion is predicated there was cross-examination.
But I thought he got through the standard of care. It was close but I thought he established that there was a standard of care that had been deviated from and then a couple of times he said had it been done appropriately, the jury would have or the verdict would have been different. . . .
. . . .
Based on the . . . notes I've taken and the standard, I'm going to deny the motion.
We agree with these rulings.
Legal malpractice is a variation on the tort of negligence. McGrogan v. Till, 167 N.J. 414, 425, 771 A.2d 1187 (2001). To establish legal malpractice, a plaintiff must show: "`(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation.'" Conklin v. Hannoch Weisman, P.C., 145 N.J. 395, 416, 678 A.2d 1060 (1996) (quoting Lovett v. Estate of Lovett, 250 N.J.Super. 79, 87, 593 A.2d 382 (Ch.Div.1991)); see also Jerista v. Murray, 185 N.J. 175, 190-91, 883 A.2d 350 (2005). As "the duties a lawyer owes to his client are not known by the average juror," expert testimony must necessarily set forth that duty and explain the breach. Stoeckel v. Twp. of Knowlton, 387 N.J.Super. 1, 14, 902 A.2d 930 (App.Div.), certif. denied, 188 N.J. 489, 909 A.2d 724 (2006); Sommers v. *1245 McKinney, 287 N.J.Super. 1, 10, 670 A.2d 99 (App.Div.1996).
Pursuant to N.J.R.E. 703, an expert's opinion must be based on "facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial." Rosenberg v. Tavorath, 352 N.J.Super. 385, 401, 800 A.2d 216 (App.Div.2002). Under the "net opinion" rule, an opinion lacking in such foundation and consisting of "`bare conclusions, unsupported by factual evidence'" is inadmissible. Johnson v. Salem Corp., 97 N.J. 78, 91, 477 A.2d 1246 (1984) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981)). The rule requires an expert "to give the why and wherefore" of his or her opinion, rather than a mere conclusion. Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App. Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). In the context of legal malpractice, an expert must base his or her opinion on standards accepted by the legal community and not merely on the expert's personally held views. Kaplan v. Skoloff & Wolfe, P.C., 339 N.J.Super. 97, 103, 770 A.2d 1258 (App.Div.2001); Stoeckel, supra, 387 N.J.Super. at 14, 902 A.2d 930.
Defendants contend that Wasserman's opinion was nothing more than a net opinion because he "failed to reference, in either his report or at trial, any written document or unwritten custom accepted by the legal community recognizing the standards that he claimed to exist." We disagree. In his report, Wasserman specifically referenced extensive case law, as well as R.P.C. 1.3, establishing that an attorney has an obligation to carefully investigate his case and diligently pursue his or her client's claims before formulating legal strategies. He also cited to cases and treatises indicating that an attorney cannot be held liable for an erroneous judgment call unless that judgment was not properly informed. As previously detailed, Wasserman then went on to identify the deficiencies he perceived in Eisenberg's preparation of the case and the resulting ill-informed judgments defendant made as to the presentation of Carbis' defense to the jury. Such deviations, he opined, constitute a violation of the tenets of the Rules of Professional Responsibility and of the general duty to exercise that degree of care, knowledge, judgment and skill that a reasonably prudent lawyer of ordinary ability would have exercised in the same or similar circumstances.
We are satisfied that Wasserman's opinion is clearly based on factual evidence of record, to which he applied generally accepted standards of care as reflected in both our case law and Rules of Professional Conduct. St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588, 443 A.2d 1052 (1982). As such, and contrary to defendants' next contention, we find the expert opinion as to defendants' violation of these rules to be competent evidence of legal malpractice, sufficient to support the jury's verdict.

(B)
Defendants' last argument is that the trial court erred in denying their motion, made for the first time at trial, for discovery of the memo prepared by plaintiffs' investigator who had interviewed McMichael. We find no merit to the issue.
Prior to the Carr trial, none of the parties made any effort to interview or depose McMichael, and he was never called upon to testify. However, plaintiffs in the legal malpractice case sent an investigator to interview McMichael and thereafter deposed him on April 21, 2005. Both in deposition, and later at trial, McMichael consistently denied ever retrieving a ladder at Carr's request. At deposition, *1246 however, he testified that he had no recollection of telling plaintiffs' investigator anything to the contrary, a suggestion perhaps implicit in the very nature of plaintiffs' counsel's question to the witness.
In any event, just before McMichael testified at trial some nine months after his deposition, defense counsel moved for the first time to compel discovery of the statement given by McMichael to plaintiffs' investigator. Plaintiffs' counsel produced for the court's in camera review the memo prepared by the investigator which, notably, did not contain any statement signed by McMichael, but rather consisted simply of the investigator's notes as to what McMichael supposedly had told him. After reviewing the document, the judge reserved decision until after McMichael's direct testimony, and thereafter denied the request, reasoning that: (1) the memo was not an actual witness statement but rather the investigator's impressions of what McMichael said along with the investigator's own interpretation; (2) there was no inconsistency between McMichael's deposition testimony and trial testimony; and (3) no showing had been made that any effort had been made to obtain the equivalent of the information by other means prior to trial.[4] We agree.
In the first place, defendants' motion was grossly out of time. The discovery period had closed months before trial without defense counsel ever filing a pretrial motion to compel the production of the investigator's memo despite knowing of its existence since at least McMichael's deposition. Cf. R. 4:24-2 ("[M]otions to compel discovery . . . must be made returnable prior to the expiration of the discovery period."). No explanation to date has been offered for this failure to act. For this reason alone, we are satisfied that there was no abuse of the trial judge's broad discretion in denying defendants' motion to compel discovery in the midst of trial. Terrell v. Schweitzer-Mauduit Int'l, Inc., 352 N.J.Super. 109, 115, 799 A.2d 667 (App.Div.2002).
Moreover, production of the memo was unlikely to have led to the discovery of competent, admissible evidence. R. 4:10-2(a) and 4:18-1(a). As evident in the trial judge's description, the memo may not properly be characterized as McMichael's statement. Unlike formal witness statements taken by an insurance carrier after the inception of litigation, see, e.g., Medford v. Duggan, 323 N.J.Super. 127, 130-31, 732 A.2d 533 (App.Div.1999), the investigator's memo was neither a transcription of the interview of McMichael nor a signed writing containing questions and answers, but merely the investigator's impressions of what McMichael purportedly said. As such, the memo could not have been used by defense counsel under N.J.R.E. 607 for impeachment of the witness' credibility. See Pfender v. Torres, 336 N.J.Super. 379, 391-92, 765 A.2d 208 (App.Div.) (granting new trial based on trial court's denial of plaintiff's pre-trial motion to compel production of tape-recorded statements made by the defendant to insurance investigator describing happening of an accident where those descriptions were contrary to the defendant's trial testimony), certif. denied, 167 N.J. 637, 772 A.2d 938 (2001).
And finally, defense counsel never demonstrated "an inability, without undue hardship, to obtain the substantial equivalent of the [memo] by other means." Medford, supra, 323 N.J.Super. at 133, 732 *1247 A.2d 533; Pfender, supra, 336 N.J.Super. at 391, 765 A.2d 208. Defense counsel could have separately interviewed McMichael or questioned him about his interview with plaintiffs' investigator during the April 2005 deposition, but opted to do neither. Instead, defense counsel cross-examined McMichael on other matters at the deposition. In sum, under the circumstances, we discern no abuse of the trial judge's discretion in denying defendants' much belated discovery request.

II
On their cross-appeal, plaintiffs urge a new trial on damages because the award was grossly disproportionate to the loss suffered. We agree with plaintiffs' argument that there is no reasonable basis to account for the damage verdict returned by the jury. However, we part company with plaintiffs' further assertion that the verdict for less than the full amount is reflective of the jury being misled by introduction of evidence that Lexington did not participate in the case. While such an explanation is certainly plausible, it is equally plausible that the jury based its damage verdict on a determination that but for defendant's negligence Carr would have received a lesser monetary verdict. The problem is that because of the manner in which the verdict was presented, it is impossible to ascertain whether the jury's damage verdict was tied to a finding that defendant was negligent in the liability phase or the damage phase of the underlying case or both. We therefore conclude that on remand the entire matter must be retried to resolve plaintiffs' cross-appeal. In so doing, we reject plaintiffs' remaining argument that the judgment should have been increased by the court to reflect disgorgement of legal fees and costs paid for the work of Eisenberg's predecessor.
At trial, plaintiffs presented an exhibit detailing their damages, which they claimed totaled $1,005,842.27, including not only the monies paid to Carr but: (1) $55,191.10 paid to Post & Schell for Wright's work and pre-trial litigation expenses and expert fees; (2) $27,575.97 paid to Post & Schell for trial and post-trial costs and expert fees; and (3) $25,127.81 paid to Stahl & DeLaurentis for post-trial and Carr appeal legal fees. Plaintiffs' counsel, in his summation, urged the jury to award this full amount. In arguing otherwise, defense counsel, in summation, and contrary to the court's earlier ruling, mentioned Lexington's assignment in the context of the excess insurer's decision not to participate in the malpractice litigation.[5] When plaintiffs' counsel voiced objection at the end of defendants' closing, the judge instructed the jury not to consider the offending remark, but failed to mention that the validity of the assignment was not in dispute or, for that matter, its putative effect on plaintiffs' damage claim. In his final charge to the jury, the judge simply *1248 instructed that it was solely in the jury's discretion what, if anything, to award plaintiffs. As noted, the jury returned a verdict of $362,561.70.
At the new trial motion, plaintiffs argued that they were entitled to a new trial on damages or additur in view of the jury's inexplicable failure to award plaintiffs the full $1,005,842.27 awarded to Carr, given the jury's general finding of legal malpractice and proximate cause, and consequently that the $362,561.70 awarded must have been the result of jury confusion created by defense counsel on the assignment issue. The trial judge denied the motion, concluding that the jury could have reached its award in a variety of ways based upon the evidence, and that he did not find the award shocking. As to plaintiffs' other argument that defendants had to disgorge the $107,894.88 paid by plaintiffs for legal services performed prior to Eisenberg's involvement, the judge noted, in part, that plaintiffs conceded at trial they had no problem paying for Beth Wright's pre-trial work.
In determining the adequacy of a damages award, the trial judge must examine the evidence in the light most favorable to the party opposing the motion for relief. Caldwell v. Haynes, 136 N.J. 422, 432, 643 A.2d 564 (1994). A trial court may not disturb a compensatory damages award in the absence of finding that it is plainly wrong or shocking to the conscience of the court. Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977). Where the claimant's right to relief is clear and the verdict was not the result of compromise or otherwise tainted, the techniques of additur and remittitur should be employed to avoid the unnecessary expense and delay of a new trial. Verdicchio v. Ricca, 179 N.J. 1, 38-39, 843 A.2d 1042 (2004). However, a new trial on damages is the appropriate remedy where the jury's verdict mandates that an omitted item of damages be awarded. Love v. Nat'l R.R. Passenger Corp., 366 N.J.Super. 525, 533, 841 A.2d 931 (App.Div.), certif. denied., 180 N.J. 355, 851 A.2d 649 (2004).
The purpose of a legal malpractice claim is to put the "`plaintiff in as good a position as he [or she] would have been had the [attorney] kept his [or her] contract.'" Saffer v. Willoughby, 143 N.J. 256, 271, 670 A.2d 527 (1996) (alterations in original) (quoting Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341, 419 A.2d 417 (1980)). Thus, "the measure of damages is ordinarily the amount that the client would have received [or would not have had to pay] but for his attorney's negligence." Gautam v. DeLuca, 215 N.J.Super. 388, 397, 521 A.2d 1343 (App. Div.), certif. denied, 109 N.J. 39, 532 A.2d 1107 (1987). Specifically, in the context of legal malpractice in the prosecution of a client's cause, resulting in dismissal of the client's complaint, "the measure of damages is ordinarily the amount that the client would have received but for [the] attorney's negligence," and is "generally shown by . . . evidence establishing [liability] and worth of the claim that was irredeemably lost." Gautam, supra, 215 N.J.Super. at 397, 521 A.2d 1343; Lieberman, supra, 84 N.J. at 342, 419 A.2d 417; Hoppe v. Ranzini, 158 N.J.Super. 158, 164, 385 A.2d 913 (App.Div.1978). By parity of reasoning, the measure of damages for legal malpractice in the defense of a client's cause is ordinarily fixed at the amount of the adverse judgment, or that portion thereof, that would not have been obtained against the client but for the attorney's negligence.
"The most common way to prove the harm inflicted by [legal] malpractice is to proceed by way of a `suit within a suit' in which a plaintiff presents the evidence *1249 that would have been submitted at trial had no malpractice occurred." Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343, 358, 845 A.2d 602 (2004). At such a trial, the plaintiff, who typically was the plaintiff in the underlying case, must prove, by a preponderance of the evidence that: "`(1) he [or she] would have recovered a judgment in the action against the main defendant, (2) the amount of that judgment, and (3) the degree of collectibility of such judgment.'" Ibid. (quoting Hoppe, supra, 158 N.J.Super. at 165, 385 A.2d 913).
However, depending on the circumstances, a legal malpractice case may proceed in other ways, including a modified "suit within a suit" or a suit employing expert testimony as to what, as a matter of reasonable probability, would have transpired at the original trial. Lieberman, supra, 84 N.J. at 343-44, 419 A.2d 417. A flexible approach is particularly warranted in the more unusual cases where the aggrieved plaintiff in the malpractice action was the defendant in the original underlying action. Id. at 343, 419 A.2d 417. In such instances, it is likely to be "awkward and impracticable" for the plaintiff to proceed "with direct proofs, as though he [or she] were the erstwhile claimant." Ibid. Ultimately it is "within the discretion of the trial judge as to the manner in which the plaintiff may proceed to prove his claim for damages." Ibid.
In Lieberman, supra, 84 N.J. at 329, 419 A.2d 417, where, as here, the plaintiff in the malpractice action was the defendant at the original trial, the attorney retained by the plaintiff neurosurgeon's professional liability insurer disregarded the plaintiff's express wishes and settled a medical malpractice action which had been brought against the plaintiff. Id. at 329, 419 A.2d 417. Because of the amount of that settlement, the claim was deemed a "chargeable claim" by plaintiff's insurance company, and plaintiff's annual malpractice insurance premiums were increased substantially. Ibid. The plaintiff subsequently sued the attorney for legal malpractice. Ibid.
Although the plaintiff prevailed at trial, an appellate panel, while not disturbing the finding of liability, reversed and remanded for a new trial on damages. Id. at 335, 419 A.2d 417. The Supreme Court affirmed these rulings. Id. at 335, 344, 419 A.2d 417. In affirming, the Lieberman Court emphasized that Lieberman was only entitled to recover for losses which were proximately caused by the attorney's negligence. Id. at 341, 419 A.2d 417. The Lieberman Court instructed that, in order to demonstrate his entitlement to reimbursement for his enhanced premiums, Lieberman was required to show: "(1) that he would have received in the [original] suit a verdict in his favor or a verdict against him [in an amount that would not have resulted in the claim being deemed chargeable], or (2) that his insurer would have settled the claim [at a non-chargeable amount]." Id. at 342, 419 A.2d 417. According to the Lieberman Court, because the trial court did not fix damages in this manner, a remand for a new trial on damages was required. Ibid.
Governed by these principles, we discern no reasonable basis in the evidence for the jury's damage award. The amount of the adverse products liability verdict  $1,005,842.27  was undisputed as was apparently the validity of the assignment of Lexington's claim.[6] Ordinarily, as already *1250 noted, where attorney negligence is proven in the defense of a claim, the measure of damages would be fixed by the adverse judgment. However, as suggested by the jury's lesser verdict in this case, defense counsel's express references in summation to Lexington's assignment had the very real capacity to mislead or confuse the jury by suggesting that either Lexington considered the case without merit in choosing not to litigate, or worse yet, an award encompassing the $500,000 paid by Lexington would constitute a windfall to plaintiffs.[7] Either way, the injection of such considerations extrinsic to the matter had the potential to prejudice plaintiffs and taint the jury verdict. For this reason alone, the damage award, disproportionate as it is to the adverse judgments against plaintiffs, is fatally suspect.
Ordinarily, the remedy would be additur or, if not accepted, a new trial on damages only, as was the case in Lieberman. Indeed, this is what plaintiffs urge. However, because of the manner in which the legal malpractice case was tried, the jury charged, and the verdict sheet drafted, we are at a loss as to whether the jury found that Carr's underlying products liability action, if properly defended, would have been altogether no-caused or simply deserving of only a portion of the total damages claimed.
More to the point, the evidence permitted the jury to reach two different conclusions as to the effect of Eisenberg's negligence: (1) that but for Eisenberg's malpractice, Carr would have received nothing in the underlying case; or (2) that but for Eisenberg's malpractice, Carr would have received a lesser verdict. Notably, although plaintiffs' counsel did not, in his summation, urge the jury to reach the latter conclusion,[8] there was a reasonable basis, from plaintiffs' own expert witness, for the jury to find that defendant's failure to call an orthopedist and/or economist resulted in an excessive damage verdict.
However, the trial judge's charge did not discuss these two possibilities nor did the verdict sheet require the jury to specify which conclusion they had drawn. To compound the matter, the trial judge did not provide the jury with any instruction as to damages, other than to simply state that it was in the jury's discretion what, if *1251 anything, to award plaintiffs. Yet, plaintiffs' request for a limited remand only on damages assumes, without basis, a jury finding that defendants committed legal malpractice in the liability phase which resulted in the adverse judgment against plaintiffs. In other words, plaintiffs ask us to assume the jury concluded that, but for Eisenberg's negligence, Carr would have received nothing in the products liability case. But, as noted, it is equally plausible that the jury instead found Carr would have prevailed regardless, but that his recovery was greater due to attorney negligence in the damages phase of trial. Because of this uncertainty, plaintiffs are not entitled, in effect, to a directed verdict on liability as would result if remand were limited, as urged by plaintiffs, to a damages-only new trial.
It has been acknowledged, in the context of legal malpractice cases, that "`[a] charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations.'" Froom v. Perel, 377 N.J.Super. 298, 312, 872 A.2d 1067 (App.Div.) (quoting Das v. Thani, 171 N.J. 518, 527, 795 A.2d 876 (2002)), certif. denied, 185 N.J. 267, 883 A.2d 1063 (2005). Likewise, our Supreme Court has encouraged the use of special interrogatories that elicit jury findings with "precision" in legal malpractice cases. Conklin v. Hannoch Weisman, 145 N.J. 395, 411-12, 678 A.2d 1060 (1996). "In the end the judge has the ultimate responsibility for insuring the correctness of the verdict sheet." Benson v. Brown, 276 N.J.Super. 553, 565, 648 A.2d 499 (App.Div.1994).
We are convinced that neither the jury charge nor verdict sheet in this case assured against a "wrong turn" in jury deliberations. Nor do they provide a basis for remanding for a new trial on damages without disturbing the findings of liability. Indeed, the only way for a jury on remand to determine what losses were proximately caused by which facets of Eisenberg's malpractice is for them to hear what that malpractice consisted of. That is, they would have to essentially hear the entire case on liability. Accordingly, the remedy on plaintiffs' cross-appeal[9] is a remand for a new trial as to all issues and all parties. R. 4:49-1.[10] We fully realize that by so ordering, defendants are given a second chance to disprove their liability. Yet, that is a risk plaintiffs advised us at oral argument that they are willing to assume as a consequence of prosecuting their cross-appeal.
Accordingly, the matter is remanded for a new trial on all issues. Although this disposition moots plaintiffs' related claim of entitlement to legal fees and costs paid for the legal services of Beth Wright, we nevertheless address the issue because of the need for a retrial occasioned by plaintiff's cross-appeal.
As part of their new trial motion, plaintiffs broadly argued that they were entitled to be reimbursed for the $107,894.88 they had previously paid to Post & Schell for Wright's work, all pre- and post-trial expenses, and the Carr appeal. *1252 The trial judge, however, believed that plaintiffs had conceded at trial that they had no problem with Wright's work, and that, in any event, under Saffer, supra, disgorgement of an entire fee is not required where there is no proven malpractice.[11]
Plaintiffs now contend that, while Wright's work may not have violated the standard of care, they should nonetheless be reimbursed for her legal fees because the law firm was hired to defend the Carr case competently and, in the final analysis, failed to do so. We disagree. Plaintiffs concede that Wright's work was not deficient and likely not the basis for the general verdict rendered by the jury. Moreover, the legal bills in this case were clearly differentiated. Under the circumstances, Saffer does not require disgorgement of legal fees and costs expended for the services of an attorney who is not negligent.
Reversed and remanded for a new trial in conformance with this opinion.
NOTES
[1] Eisenberg did challenge Carr's credibility to some extent by entering into evidence, during Ryan's testimony, Red Lion work sheets that showed that Red Lion had completed all insulation work at Carriage Park two days before the supposed accident, and that Carr had worked for thirteen hours the Monday after the accident when he supposedly went to the hospital and then again on Tuesday, the day he was supposedly fired.
[2] Notably, although Carbis, through the Safe Step policy, had paid $55,191.10 to Post & Schell for the work of Beth Wright, a former member of the firm who preceded Eisenberg on the file, and an additional $27,575.97 for trial and post-trial costs and expert fees, they refused to pay the legal fees for Eisenberg's work, which totaled $29,543.42. Carbis appealed the judgment against it in Carr, incurring legal fees of $25,127.81, but the judgment was affirmed in an unpublished opinion dated July 13, 1999.
[3] Lexington elected not to participate in the litigation but assigned its right to any recovery to plaintiffs.
[4] At defendants' behest, however, defense counsel was allowed to ask McMichael if he had ever made a statement contrary to his trial testimony, but that if the witness denied making any such statement, no further inquiry would be permitted.
[5] Thus, in summation, defense counsel argued:

The insurance company is the plaintiff. That's Safe Step Insurance Company. But do you remember, about a week ago  about a week ago, the Judge read you a document that I suggest to you is important because it tells you, and Kramer testified to it, who is not a defendant or who is not a plaintiff.
Do you remember when Mr. Kramer told you, we paid $395,000 as a result of that lawsuit that we lost because we had already paid $105,000 in legal expenses for the three years in trial preparation. They had to write 18 depositions, all this work. The only thing left of the $500,000 policy we had was 395 and we paid that because we lost.
And then Lexington Insurance Company, who had the second layer of coverage, they paid $500,000 because they lost. They were part of the coverage.
. . . .
[6] Other than this lack of dispute, the record does not afford an independent basis to ascertain the legality of the Lexington assignment or whether it was in fact supported by adequate consideration. Also absent is a ruling by the trial judge as to the legal effect of the assignment on plaintiffs' damages claim. On remand, these issues should be determined by the trial judge in limine.
[7] To be sure, the jury damage award may have been the result of some other view of the evidence but even the trial judge, on plaintiffs' motion for new trial/additur, could not articulate a reasonable basis.
[8] In his summation, plaintiffs' counsel addressed the jury as follows:

At the end, you're [going to] get the jury verdict sheet. And the first question's [going to] say, "Was he negligent?" If you think that he was . . . that his work wasn't consistent with what you're expecting of a competent lawyer, then the answer to that is yes.
And the second question is [going to] be, "Was his negligence," and the Judge will go over this with you too, "Was his negligence the proximate cause  a proximate cause?" Was it something that contributed to Dennis Carr getting away with this big fat lie? If you decide the answer to that is yes, then you go on to the next question which is money.
And the question is between what was paid to Dennis Carr and what was paid to his ex-wife and what was paid Post & Schell, you'll get the number back there, it's in one of our exhibits, it's a million and five thousand dollars. That's the number.
If you decide that Mr. Eisenberg's work and Post & Schell's work wasn't up to speed, or either of them, . . . [then] what you've [got to] say, it's your responsibility, you've [got to] give that back. And the number to fill in is a million and five thousand dollars.
[9] We note that defendants do not challenge on their own appeal the quantum of damages awarded by the jury.
[10] On retrial, if the proofs so indicate, the judge should distinguish, in both the jury charge and the verdict sheet, between on the one hand a finding of negligence on the part of defendant in the liability phase of the Carr case and damages proximately resulting therefrom, and on the other a finding of negligence in the damage portion and the amount of damages proximately resulting from such a finding, so as to give the jury an adequate road map on the manner in which to render its verdict.
[11] The trial judge did not address the question of plaintiffs' entitlement to reimbursement for costs and expert fees or the fees paid for the Carr appeal.