# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1646-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.F.,

     Defendant,

and

A.Z.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.Z., JR.,
ADR.Z., AL.Z., AN.Z., ADO.Z.,
and AM.Z., minors.

_____

Submitted October 7, 2025 – Decided November 14, 2025

Before Judges Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0046-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Mark E. Kleiman, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors A.Z., Jr., ADR.Z., AL.Z., AN.Z., ADO.Z., and AM.Z. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.Z. (Father) appeals from the January 16, 2025 Family Part judgment terminating his parental rights to his six children.[1] We affirm.

I.

Father and defendant A.F. (Mother) are the biological parents of A.Z., Jr. (Aaron), ADR.Z. (Alyssa), AL.Z. (Antoine), AN.Z. (Ava), ADO.Z. (Adam), and AM.Z. (Amelia).

---

[1] We identify the parties and their children by initials and pseudonyms to protect confidential information in the record. R. 1:38-3(d)(12).

Plaintiff Division of Child Protection and Permanency (DCPP or the Division) first became involved with the family in 2012, following referrals for substance abuse, domestic violence, and neglect of the children's medical and educational needs. DCPP had contact with the family on multiple occasions in the years that followed.

In 2021, DCPP received a referral from the hospital where Mother was taken after giving birth to Adam at home. The child was born with marijuana, amphetamines, and methamphetamines in his system and was showing signs of withdrawal. DCPP became further involved with the family and implemented a safety protection plan, which limited Mother to supervised visits with the children while she addressed her substance abuse. The Division would not approve Father as a supervisor for the visits because of past allegations of domestic violence.

While working with the family, DCPP determined Father and Mother were not caring for their children or ensuring their attendance at school. DCPP offered Father services such as individual counseling, marriage counseling, and Family Preservation Services (FPS), in addition to the help being provided to Mother. DCPP implemented FPS services in the home, but Father refused to

3

participate.[2]  He also refused to engage in individual therapy and parenting classes.  DCPP scheduled a substance abuse evaluation for Father.  He failed to attend.  He also failed to appear for the rescheduled appointment.

On January 14, 2022, DCPP petitioned the Family Part for care and supervision of the five oldest children.  The court granted the Division's request, based on its finding domestic violence in the home and medical and educational neglect of the children.  The court directed Father to attend individual and family counseling, and to ensure the children "attend school daily and on time."  Father did not attend the court-ordered counseling, the children continued to be inconsistent in their school attendance, and Father failed to bring the children to medical appointments.  Two-month-old Adam had still not seen a physician, even though DCPP offered to pay the cost of his medical care.

Alyssa, who was in kindergarten, had missed a significant amount of school.  When she did attend, school personnel had concerns about her appearance and hygiene.  The child appeared embarrassed that her hair was "severely matted."  By February 2022, the back of Alyssa's hair had been cut

---

[2]  FPS is an intensive, in-home crisis intervention, and family education program.

A-1646-24

short, while the front remained long. Mother reported she cut gum, toothpaste, and "other things" out of the child's hair.

Father often refused to produce the children or allow them to privately speak to Division workers. He did not answer phone calls or door knocks and would often not allow DCPP into the home. Although Father refused to cooperate with all services, he readily accepted monetary help. The Division provided necessities for the family such as a refrigerator, a washing machine, car seats, furniture, groceries, and clothes.

In July 2022, Mother was diagnosed with multiple sclerosis. Mother's condition resulted in her being immobile on occasion and unable to take care of the children without assistance. Father was aware of Mother's medical condition and agreed to act as supervisor to monitor the children when they were in Mother's care. Father, however, continued to leave Mother alone with the children. When DCPP confronted Father about the danger of leaving young children with Mother, he insisted she was "faking" her illness. During this time, Father also neglected the children's medical and educational needs as they continued to miss school and scheduled medical appointments.

On October 25, 2022, DCPP learned Mother had overdosed and was revived with Narcan while four of the children were present. The Division

provided substance abuse services to Mother and again recommended FPS to Mother and Father to rehabilitate the family. Both declined to participate. On November 17, 2022, DCPP again recommended FPS to the family. Mother and Father agreed but refused to follow the plan for family unit maintenance. They did not register one of the children for kindergarten, despite having been provided registration material on three occasions.

In December 2022, DCPP filed for custody, care, and supervision of the five oldest children. The trial court granted DCPP's request after finding the children were at risk because Mother and Father were neglecting their medical, educational, and emotional needs. The children were placed in the custody of Mother's mother (Maternal Grandmother). When the children were removed from the home, Aaron had to be treated for lice, Antoine had a temperature of over one hundred degrees, Adam had a severe rash in his genital area, and all the children had bed bug bites.

Father recommended his sister (Paternal Aunt) and mother (Paternal Grandmother) as caretakers for the children. However, both said they would be unable to serve in that role.

After removing the children from the home, DCPP offered Father supervised visitation. One week later, Father participated in his first and last

supervised visit with the children. DCPP noted the visit was positive and upon seeing him the children indicated they missed Father. After the first visit, however, Father stopped responding to DCPP, which tried to reach him through visits to his home, phone calls, and certified mail.

On February 4, 2023, Mother gave birth to Amelia at home. Mother admitted using marijuana and cocaine during pregnancy. She did not receive prenatal care. Mother and Father did not have essentials for the baby, including a car seat and clothing.

Father visited the hospital on February 6, 2023. A DCPP caseworker reported Father was "upset and hyper," had dilated pupils, and would not maintain eye contact with the caseworker. Father refused a urine drug screen, denied knowledge of Mother's drug use, and would not allow DCPP to conduct a home assessment. Father again became unreachable after leaving the hospital.

Amelia remained in the hospital for five days while she was evaluated for withdrawal. On February 10, 2023, DCPP emergently took custody of Amelia and placed her in the custody of Mother's godmother (Godmother) because the Maternal Grandmother could not accommodate another child.

On March 6, 2023, Mother filed for and was granted a temporary restraining order (TRO) against Father pursuant to the Prevention of Domestic

A-1646-24

Violence Act, N.J.S.A. 2C:25-17 to -35, following a domestic violence incident. Maternal Grandmother reported Mother appeared at her home that day with her hair cut off and showed signs of being "burned" and "beaten." Mother disclosed she had been "handcuffed and tortured at gunpoint" by Father, who was criminally charged and incarcerated for the assault.[3] The TRO barred him from having contact with Mother, Maternal Grandmother, and the children.

At a March 10, 2023 hearing in the DCPP matter, the trial court ordered Father to have no visits with the children because of the TRO. Neither Aaron nor Alyssa wanted to visit with Father because he "hurt" Mother and made her cry. Father did not contact DCPP upon being released from jail. However, on April 14, 2023, Mother reported Father had been released and was harassing and threatening to hurt her.

On April 28, 2023, a court issued a final restraining order (FRO) against Father, barring him from contacting Mother, Maternal Grandmother, and the children. The court ordered Father to undergo a psychiatric evaluation and a substance abuse evaluation, and complete an anger management class and a batterer's intervention program. The court also issued a warrant authorizing police to remove Father's handgun.

---

[3] The record does not reflect the disposition of the criminal charges.

Father again went missing in spring 2023, but appeared virtually at a June 2023 court proceeding. During the proceeding, the court informed Father he would have to request a modification of the FRO if he wanted to visit with the children. Father informed DCPP he was homeless and refused to provide his contact information on the record but claimed he would have his attorney give the information to the Division. DCPP never received Father's contact information and Father took no action to modify or vacate the FRO.

Father remained out of contact with DCPP for the remainder of the protective services litigation. Unable to contact Father, DCPP filed an affidavit of diligent inquiry pursuant to Rule 5:12-2(b).

On April 1, 2024, DCPP filed for guardianship of the children. Around this time, a Division caseworker learned Father had been incarcerated on criminal charges of child prostitution and sex trafficking of a minor. A DCPP caseworker arranged to meet with Father monthly. He remained incarcerated for the duration of the guardianship litigation.[4]

During a visit with Father, a DCPP caseworker inquired about completing services while in jail. Father reported he had completed certain services but

---

[4] The record does not reflect the outcome of these criminal charges. However, according to Father's merits brief, at the time the brief was filed he remained incarcerated at the Essex County jail awaiting trial.

A-1646-24

could not provide a point of contact to verify his progress. The Division arranged for Father to undergo a psychological evaluation.

The psychological evaluation concluded Father "remains a high risk for violence, abuse, and exploitation of others" and "was not consistent in addressing the scholastic, medical, emotional and environmental needs of the children." During the evaluation, Father denied engaging in domestic violence or criminal activity. He claimed that "he [was] the victim in the case and that all of the varied allegations, reports, findings and court rulings are false and part of a conspiracy against him." The evaluation found Father cannot parent the children now and was unlikely to be able to do so in the foreseeable future. Thus, the evaluation recommended termination of Father's parental rights.

The psychologist also evaluated Aaron and Alyssa. Aaron reported "very violent" acts of domestic violence in the family and said Father beat him "all the time." He described Father beating him with a black belt, leaving "bruising and bleeding." Aaron told the psychologist he did not want contact with Father, and both children asked to stay with Maternal Grandmother. Alyssa disclosed witnessing Father beat Mother and said Father used a belt to beat her.

The psychologist conducted individual bonding evaluations between Amelia and Mother and Amelia and Godmother, her resource parent. Because

 A-1646-24

of the restraining order barring Father from contact with the children, no bonding evaluation was conducted between Father and the children.

Mother surrendered her parental rights to the children before the guardianship trial commenced. The trial with respect to Father's parental rights took place over two days. The Division called as an expert witness the psychologist who conducted the evaluations, two DCPP caseworkers, Maternal Grandmother, and Godmother. Father did not present any witnesses. The Law Guardian for the children supported termination of Father's parental rights.

On January 16, 2025, the trial court issued an oral decision, finding DCPP established all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence and concluding termination of Father's parental rights would be in the children's best interests.

The court found Father was largely withdrawn from assisting his children and did not meet the responsibilities of a parent. The court found when Father had custody of the children, he consistently failed to ensure they were enrolled in or attended school, appeared for medical appointments, and maintained healthy levels of personal hygiene. The court noted when DCPP became involved with the family, Father was often hostile to caseworkers, refused to

comply with services tailored to issues identified in the home, and left the children in unsafe situations despite available safe alternatives.

The court found Father was missing for significant amounts of time, engaged in no services, did not visit with the children, and had refused efforts by the Division to contact him. The court also found Father's failure to remain in contact with DCPP or take action to modify the FRO demonstrated a lack of intent to engage in meaningful reunification efforts with the children. The court concluded there was no indication in the record Father "will be able to remediate the risk to these children. The proofs show, instead, that he is unwilling, by his conduct, or lack of conduct, and unable to eliminate the harm facing the children. And the delay of that permanency for the children will add to the harm." The court noted Father was detained pretrial on serious charges, had no scheduled release date from detention, and offered no plan to provide a stable home for the children.

The court also found DCPP made reasonable efforts to help Father address the issues preventing him from having custody of his children. The Division offered services, including "providing [Father] with school enrollment documents, offering to go to the . . . psychological evaluation with Father," "offering to provide rides" to the children's appointments and the services

recommended to Father and gave Father significant financial help to purchase essentials for the children. The court found DCPP also offered individual services for Father to develop his parenting skills and get psychological counseling, all of which he refused. The court found Father "wanted the financial help from the [D]ivision, but continuously refused any services." In addition, during the litigation, the court ordered Father to engage in several treatments and services, but he failed to comply with the court's directives.

Given Father's failure to comply with treatment or take steps to meaningfully rehabilitate his relationship with the children, the court determined Father's actions showed he could not meet the educational, medical, or day-to-day needs of the children. The court noted the evidence and testimony made it clear "[Father] never made it safe to place the children back with him. He did not visit, he did not provide for them, he did not protect them. He never took responsibility to care for them or nurture them."

The court found DCPP considered alternatives to termination of his parental rights, but no viable option existed. For example, the Division explored Father's recommendations for Paternal Aunt or Paternal Grandmother to be guardians for the children, but both told the Division they were unwilling to take on that role. The court found the resource parents clearly made their preference

13

for adoption known after kinship legal guardianship (KLG) was explained to them. The court found there was no compelling argument for KLG and the children's best interests would be served through adoption. The court also found the five older children were doing well with Maternal Grandmother, and Father had no relationship with the youngest child, who was in the custody of Godmother, as he had seen her only once when visiting the hospital days after her birth. The court found the youngest child was also doing well with Godmother, who wanted to adopt her.

The court credited the testimony of the psychologist and the recommendations made after his evaluation of Father and three of the children. The court found notable the expert's testimony Father has a history of violence, intimidation, and exploitation of others, particularly those who are vulnerable. In addition, the court noted Father's claims of being the victim of a conspiracy and his denial of any wrongdoing. The court accepted the expert's conclusion Father was unable to care for the children and unlikely to be able to do so in the foreseeable future.

Balancing the children's need for permanency against the Father's parental rights, the court found termination of Father's rights was warranted, given the limited harm that would befall the children from a severing of their relationship

A-1646-24

with Father as compared to the benefits they would enjoy from the permanency and stability offered to them by their resource parents. A January 16, 2025 judgment memorialized the court's decision.

This appeal follows. Father argues the trial court erred when it: (1) found DCPP made "reasonable efforts" to offer appropriate remedial services while Father was incarcerated; (2) found DCPP demonstrated by "clear and convincing evidence" termination of Father's parental rights will not do more harm than good; (3) based its conclusions on the expert's net opinion; (4) allowed one of the caseworkers to offer a lay opinion with respect to the bond between the children and their resource parents; (5) reached a decision without requiring an assessment of Godmother's adult daughter who lives in Godmother's house; (6) failed to order a comparative bonding evaluation of the children with their resource parents and Father; and (7) ordered termination of Father's parental rights because KLG remains a viable option for the children. The Law Guardian argues the trial court's decision is supported by the record.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate,

substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). We give no deference to the trial court's "interpretation of the law," which we review de novo. D.W. v. R.W., 212 N.J. 232, 245 (2012).

"New Jersey's child-welfare laws balance 'two competing interests: a parent's constitutionally protected right "to raise a child and maintain a relationship with that child, without undue influence by the [S]tate," and "the State's parens patriae responsibility to protect the welfare of children."'" N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021)

16

(alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013)). To ensure the rights of the parent are adequately protected "[t]he New Jersey Legislature has long mandated . . . [DCPP] must prove by clear and convincing evidence all four prongs of the 'best interests' test set forth in N.J.S.A. 30:4C-15.1(a)," before terminating parental rights. N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 7-8 (2023).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires DCPP to prove:

> (1)    The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)    The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

Father argues DCPP did not establish prongs three and four of the statutory test. With respect to prong three, he argues the Division failed to provide him with sufficient services while he was detained at the Essex County jail on charges alleging he engaged in sex trafficking of a minor. In addition, he argues while DCPP "may have been hamstrung as it relates to visitation or bonding evaluations because of the" domestic violence restraining order, it failed to investigate what programs it might have offered during his pretrial detention.

Under prong three, DCPP's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of DMH, 161 N.J. 365, 390 (1999). N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [DCPP] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in

18

reinforcing the family structure . . . ." The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

While Father focuses on the services he received while detained in the county jail, he overlooks his failure to take advantage of the myriad services DCPP offered him before his detention. The record firmly establishes Father refused to meaningfully engage in any of the services offered to him by the Division before he was arrested, apart from his willingness to receive financial aid. He consistently refused to cooperate with the Division, failed to attend scheduled services, visited his five oldest children only once, and disappeared for long periods of time during which he was unreachable. Father saw Amelia only one time a few days after her birth. He never again made any attempt to visit that child.

A-1646-24

We must examine the Division's provision of services to Father during his pretrial detention in the context of his utter abandonment of his parental responsibilities prior to his arrest. In addition, Father's acts of domestic violence against Mother, in the presence of two of his children, resulted in the entry of an FRO prohibiting him from having contact with his children. As Father acknowledges, the FRO precluded the Division from arranging for visitation between him and the children during his pretrial detention. Father was informed he could petition the court that entered the FRO to modify its provisions to allow him to visit with the children, even if just for the purposes of conducting a bonding evaluation. However, he failed to take any steps to seek that relief. In light of the facts and circumstances of this case, we see no basis on which to conclude the Division failed to make reasonable efforts to reunify Father with his children either prior to or after his pretrial detention.[5]

With respect to the fourth prong, Father argues it was error to terminate his parental rights in the absence of a bonding evaluation between the five older children and Maternal Grandmother and those children and Father. He also

---

[5] We note "incarceration alone – without particularized evidence of how a parent's incarceration affects each prong of the best-interests-of-the-child standard – is an insufficient basis for terminating parental rights." R.G., 217 N.J. at 556.

A-1646-24

argues the court relied on the net opinion of the psychologist, who had not met three of the older children, with respect to their bond with Maternal Grandmother and Father. We disagree.

The fourth prong requires DCPP to show "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from permanent disruption of her relationship with her foster parents." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 181 (2010) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

A-1646-24

Generally, to prove the fourth prong, DCPP "should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007)); see R.G., 217 N.J. at 564 (finding the Division's position lacked support because "no bonding evaluation was conducted"); N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 432 (App. Div. 2009) (affirming an order denying the termination of parental rights where no bonding evaluation was conducted).

"N.J.R.E. 703 addresses the foundation for expert testimony." Townsend v. Pierre, 221 N.J. 36, 53 (2015). "[A]n expert's opinion must be based on 'facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial.'" Carbis Sales, Inc. v. Eisenberg, 397 N.J. Super. 64, 78-79 (App. Div. 2007) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). "[A] trial court may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011). "Under the 'net opinion' rule, an opinion lacking in such foundation and consisting of 'bare conclusions, unsupported by

22

factual evidence' is inadmissible." Carbis Sales, 397 N.J. Super. at 79 (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)).

The psychologist's opinion was based primarily on his evaluation of Father, including his history of failing to provide meaningful parenting to his children, and his propensity for violence. The expert opined Father was incapable of parenting at that time and was unlikely to be able to parent in the foreseeable future. The trial court primarily relied on that aspect of the expert's testimony when it found prong four of the statute had been satisfied. See N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996) (termination of parental rights may be predicated on a parent's inability to care for a child in the foreseeable future and the child's need for permanency).

The expert's ability to perform a bonding evaluation between the children and Father was stymied by the FRO, from which Father failed to seek relief for a bonding evaluation. In these circumstances, we see no error in the expert's reliance on the Father's history of failing to meaningfully parent the children as the basis for his opinion. Nor do we see a basis for reversing the trial court's decision based on the caseworker's testimony regarding the bond between the children and Maternal Grandmother. Nothing in the record suggests the court considered the caseworker's testimony on that point to be crucial to its finding

23

that termination of Father's parental rights was warranted. The court's decision is primarily based on Father's long-term failure to provide his children with meaningful parental supervision and the dim prospects for him remedying the situation after resolution of his then-pending serious criminal charges.

We have considered Father's remaining arguments, some of which were raised for the first time on appeal, and we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1646-24